IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRUCE L. WISHNEFSKY, | |
| Plaintiff, | Civil Action No. 08-128J |
| v. | District Judge Kim R. Gibson |
| | Magistrate Judge Lisa Pupo Lenihan |
| JAWAD A. SALAMEH, | |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

For the reasons stated below, it is respectfully recommended that Defendant's Motion for Summary Judgment (ECF. No. 54) be granted and that Plaintiff's Motion for Summary Judgment (ECF No. 57) be denied.

### II. REPORT

Plaintiff Bruce L. Wishnefsky (Plaintiff), an inmate currently housed at the State Correctional Institution at Laurel Highlands, Pennsylvania (SCI-Laurel Highlands), brings this civil action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. Named as the sole Defendant is the medical director of SCI-Laurel Highlands, Jawad A. Salameh, M.D., (Defendant). On February 24, 2010, District Judge Kim R. Gibson granted Defendant's Motion to Dismiss with respect to all of Plaintiff's Eighth Amendment medical treatment claims except his claim arising from the alleged delay of medical treatment between 5/17/2007 to 5/22/2007 and dismissed Plaintiff's State law medical battery claim for lack of jurisdiction (ECF No. 34). Presently pending before the Court are motions for summary judgment filed by both Plaintiff (ECF No. 57) and Defendant (ECF No. 54).

For the reasons that follow, Defendant's Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

A.   Standard of Review

Pursuant to Fed. R. Civ. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir. 1999), Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Specifically, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient

cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998). Moreover, the non-moving party cannot defeat a well supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

B.     Statement of Relevant Undisputed Facts

Plaintiff suffers from several medical conditions, including Parkinson's Disease, Osteoarthritis of his lower spine, and Benign Prostatic Hyperplasia (BPH). On May 12, 2007, Plaintiff, exhibiting symptoms of dizziness and low blood-pressure, was admitted to the long term care unit at SCI-Laurel Highlands.[1] On May 13, 2007, Dr. Mollura ordered labwork, including a CBC, to be done (ECF No. 59-4, p. 17). Dr. Robinson ordered the labs to Somerset Hospital on May 14, 2007 and also ordered fluids and directed that Plaintiff be housed in A Unit. On May 14, 2007, the clinical laboratory at Somerset Hospital issued a report with findings of the lab work. The report

---

1. Plaintiff characterizes the long term care unit as "a skilled nursing facility," which is not equipped to treat acutely ill patients.

was reviewed by Dr. Robinson on May 15, 2007, who noted it was not clinically significant (ECF No. 59-5). Dr. Salameh also reviewed the report and noted it was not clinically significant (ECF No. 59-13).

Over the next few days, on May 16 and 17, 2007, Plaintiff became disoriented, confused, and had slurred speech and loose associations. On May 16, 2007, Dr. Robinson ordered a consult for physical therapy, which was approved the next day by Dr. Salameh. Dr. Robinson also referred Plaintiff to Dr. Karmudi, a psychiatrist, who opined that Plaintiff suffered from encephalopathy as a secondary medical condition.

On Thursday, May 17, 2007, Plaintiff's medical records indicate that he was examined by Dr. Robinson at 12:45 p.m. who noted that Plaintiff was "clearer mentally" (ECF No. 59-3, p. 27). Plaintiff's BP was 98/46 and his stool was black and tarry. Dr. Robinson ordered more lab work (a complete blood count CBC) and a change to Wishnefsky's medication (ECF No. 59-4, p. 15). There is no medical indication in the record that the lab work was designated as "stat." His records state that he was awake and oriented and able to follow simple commands. It further states that he did have loose associations and rambling but that he was improved from the day before (ECF No. 59-3, p. 27).

On May 18, 2007, Plaintiff was observed as "alert and oriented" and asking about his property. Dr. Robinson examined him at 10:30 a.m. and noted that he was stable and not confused, his blood pressure was 113/60 and that the only issue appeared to be a suspected GI bleed (ECF No. 59-3, p. 28). Dr. Robinson ordered that Wisnefsky's stool be monitored for seven days as he questioned some type of internal bleed (ECF No. 59-4, p. 14). Later that day Plaintiff stated "I'm doing just fine today" and it was noted that his speech was completely clear and that no rambling or

loose associations were noted (ECF No. 59-3, p. 28). His record further provides "awaiting on lab results that was [sic] ordered on 5/17/07." *Id*.

On May 19, 2007, Plaintiff's record indicates that he stated "I feel better today" and staff notes indicate that he was "alert and oriented to person, place and time." ECF No. 59-3, p. 25. The medical record further shows that on May 19, 2007, and May 20, 2007, bowel movements tested positive for occult blood. On May 20, 2007, medical records indicate that Plaintiff was pale and tremulous. He was instructed to stay in bed as a G2 bleed was suspected and he was continued to be monitored (ECF No. 59-3, p. 26). On May 21, 2007, his color was noted as "not as pale" and his condition was noted as "improved physically per monitor" ECF No. 59-3, p. 26). His chart further indicates that he stated "I feel great" and that his speech was clear, he denied any dizziness and had a good appetite. The chart indicates that medical was instructed to monitor and follow plan of care and have labs drawn tomorrow. On May 21, 2007, Dr. Robinson ordered suppositories and additional medical tests, including an EKG (ECF No. 59-4, p. 14).

On May 22, 2007, Wishnefsky reported "I'm doing pretty good" and it was noted that no medical complaints were voiced and his blood pressure was stable (ECF No. 59-3, p. 23). On that same date, Dr. Salameh examined Wishnefsky who stated that he wanted to go to yard. Dr. Salameh's notes indicate that Plaintiff was pale, his BP was 116/70, his pulse was 95, his lungs were clear and his abdomen benign (ECF No. 59-3, p. 23). Dr. Salameh concluded that Plaintiff was clinically stable and that he was awaiting the results of the CBC tests today. He wrote orders to keep Plaintiff in the A unit (the infirmary) for observation. Later that day, Plaintiff's records indicate that he told the nursing staff "I feel alright" and it was noted that he was alert, oriented, verbal and ambulatory (ECF No. 59-3, p. 24). On May 22, 2007, Wishnefsky also met with the physical

therapist. (ECF No. 59-10).

On May 23, 2007, Dr. Noel, ordered that the CBC be redrawn stat to Somerset Hospital because the CBC tube was clotted (ECF No. 59-3, p. 21; 59-4, p. 14). Later that day, Plaintiff ate supper in the day room and was noted as being "awake, alert, oriented, verbal and ambulatory" (ECF No. 59-3, p. 21). His blood pressure was noted as 120/70.

On May 24, 2007, at 8:00 a.m., Plaintiff complained that he needed a mat because he was dribbling urine (ECF No. 59-3, p. 21). His blood pressure was noted as 106/60. At approximately 1:45 p.m. Plaintiff was transferred to Somerset Hospital as ordered by Dr. Salameh because of his low hemoglobin level of 4.4 (ECF No. 59-3, p. 22). Upon admission, his physical exam was quite unremarkable apart from a distended bladder and pallor. His cardiac enzymes were negative and his chest x-ray was unremarkable. Because of his low hemoglobin level of 4.4, he was transfused with five units of blood, which elevated his blood count to 9.6. He also underwent an upper and lower GI, a bleeding scan and a biopsy; he was discharged back to SCI-Laurel Highlands on May 26, 2007. The Upper GI endoscopy showed a non-healing gastric ulcer and the bleeding scan yielded positive results for bleeding from the transverse colon. He was diagnosed as suffering from severe anemia, probably secondary to gastric ulcer (ECF No. 61-3, p. 18).

Plaintiff filed only one grievance regarding the remaining claims in this suit. Specifically, Grievance No. 197465 dated August 15, 2007, provides as follows.

> My attorney recently requested and paid $116.95 for copies of my medical records, which were mailed to him on or about July 23, 2007. After having an RN in his office review my records I have now been 1nformed by his office that my blood pressure on May 14, 2007 was as low as 58/50, standing (which was not revealed to me at the time), that I was disoriented and rambling, without knowing I was disoriented and rambling, and had loose associations on May 16,

> 2007 and that even though a CBC was ordered for me on May 17, 2007 by Dr. Robinson, my blood was not drawn for this CBC until May 22, 2007. In spite of my blood pressure readings and disoriented and rambling speech I was not taken to Somerset Hospital until May 24, 2007, for five pints of blood. This was more than a week after I should have been taken there for my acute medical problem. I request unliquidated damages to compensate me for the delay in sending me to Somerset Hospital to treat my acute problem that obviously could not have been treated in a skilled nursing facility, such as A block.
>
> I made the above request to Ms. Kowalewski, RN, CHCA, on August 13, 2007, who denied my request on August 14, 2007, which denial was received by me on August 15, 2007.

ECF No. 59-2, p. 6. As is apparently clear, the grievance does not mention Dr. Salameh directly or indirectly.

On August 21, 2007, Plaintiff received the following response to his grievance.

- Ms. Kowalewski did respond to your request on 8/14/07 and stated you were monitored appropriately and you received adequate medical treatment.

- You were seen in Outpatient on 5/12/07. You were brought over to the Outpatient Department in a wheelchair by nursing staff.

- You were assessed, vital signs completed, oxygen saturations checked, EKG completed, and seen by Dr. Mollura. Medication was adjusted and an IV was started. You were being monitored closely on A block by 24 hour nursing staff.

- On 5/13/07, you were reseen by Dr. Mollura and labs were ordered for 5/14/07. You continued to be monitored by 24 hour nursing staff.

- On 5/14/07, labs were completed and you were seen by Dr. Robinson. IV fluids were adjusted and you continued to be closely monitored by nursing staff.

- On 5/15-17/07, Dr. Robinson reviewed you again and made appropriate adjustments. Dr. Robinson did order labs on 5/17/07 but for the following week. These were completed on 5/22/07.

> Medical staff monitored you closely and notified the physicians of any changes and followed through with your prescribed medical plan of care.
>
> Therefore, your grievance is without merit and it is denied.

ECF No. 59-2, p. 7. Plaintiff unsuccessfully appealed this denial through all appropriate channels.

C.     <u>Plaintiff's Claim is Procedurally Defaulted</u>

In support of his motion for summary judgment, Defendant first argues that, pursuant to <u>Spruill v. Gillis</u>, 372 F.3d 218, 230 (3d Cir. 2004), Plaintiff has procedurally defaulted his claims against him because he failed to name him in any grievances. Defendant is correct.

Pursuant to 42 U.S.C. § 1997(e)(a) of the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The pertinent Pennsylvania Department of Corrections (DOC) policy establishing what administrative remedies are available to prisoners in DOC institutions was promulgated in DC-ADM 804. DC-ADM 804 explicitly requires that the prisoner specifically name individuals in the grievance in order to exhaust under the PLRA.

In <u>Spruill</u>, the Court of Appeals was confronted with a situation where, although the Pennsylvania prisoner had filed a grievance, the grievance failed to mention one of the people whom the prisoner subsequently named as a defendant in a civil rights action based on the same events as the grievance. The Court held that because the grievance did not mention the particular individual by the name of Brown, the prisoner-plaintiff had procedurally defaulted his claims against Brown. The holding of <u>Spruill</u>, in this respect, is precisely on point:

> [t]he passage quoted above regarding the contents of the grievance is also the only section of the Grievance System Policy requiring that

> the grievance identify specific persons. On this matter, the text is mandatory, or nearly so: "The inmate shall include a statement of the facts relevant to the claim.... The inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally." DC-ADM 804, Part VI.A.1.d. To the extent that Brown's identity is a "fact[ ] relevant to the claim"-and it is-it was mandatory for Spruill to include it. To the extent that Brown was a "person[ ] who may have information" or someone with whom Spruill made "attempts to resolve the matter informally"-and he was-Spruill was required to identify Brown if practicable. Spruill did not, and has offered no explanation for his failure to do so. Any grievance against Brown would now be time-barred. See DC-ADM 804, Part VI.A.1.e ("Grievances must be submitted by the inmate ... within fifteen (15) working days after the events on which the claims are based."). Thus Spruill has procedurally defaulted a claim against Brown by failing to identify him.

Spruill, 372 F.3d at 234.

The United States Supreme Court adopted a similar holding in Woodford v. Ngo, 548 U.S. 81 (2006) wherein it held that an untimely or otherwise procedurally defective administrative grievance or appeal does not satisfy the PLRA's mandatory exhaustion requirement.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." This Court has described the doctrine as follows: "[A]s a general rule ⋯ courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice." Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

Woodford, 548 U.S. at 90-91 (internal citations, quotations and footnotes omitted). The Court

further noted that "[c]onstruing § 1997e(a) to require proper exhaustion also fits with the general scheme of the PLRA, whereas respondent's interpretation would turn that provision into a largely useless appendage. The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford, 548 U.S. at 93. The Court concluded that the benefits of exhaustion could only be realized if the prison grievance system is given a fair opportunity to consider the claims, which required the grievant to comply with the procedural rules. *Id*. at 94.

In the instant action the Defendant, Dr. Salameh, is not identified in any level of review of Plaintiff's Grievance (ECF No. 59-2) (the record of the grievance and subsequent administrative appeals). Accordingly, Defendant Salameh has carried his summary judgment burden to produce evidence to show Plaintiff has failed to exhaust his claim. *See* Ray v. Kertes, 285 F.3d 287, 293 n. 5 (3d Cir. 2002) (holding that exhaustion is an affirmative defense which means defendants have burden of proof to establish non-exhaustion).

In response, Plaintiff does not attempt to challenge the fact that he failed to name Defendant in the grievance process; rather, he argues the legal significance of not doing so. It is clear that Plaintiff was required to name the responsible individuals in the initial grievance or in the appeals process, if that was the first time he became aware of him. Moreover, in his initial grievance, Plaintiff specifically states that his attorney had receipt of his medical records on July 23, 2007, almost one whole month before he filed the grievance on August 15, 2007. Thus, by his own admission, he knew, or should have known about Dr. Salameh before he filed the Grievance on August 15, 2007.

Failure to name Defendant Salameh at any time in the grievance procedure constitutes a procedural default. Finding these provisions to require the naming of the Defendants at the first opportunity available effectuates the goals of putting the prison officials on notice of the persons claimed to be guilty of wrongdoing as was explained by Spruill: "[t]he purpose of the regulation here [i.e., regarding the initial grievance] is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." Spruill, 372 F.3d at 234. To provide fair notice of a claim, the plaintiff must allege specific acts of mistreatment or misconduct and identify the responsible party or parties.". Having not been able to name the individuals responsible for the destruction of his property in the initial grievance, Plaintiff was required to name them in his appeals. Having failed to do so, he failed to give the prison authorities notice of the responsible individual and, therefore, procedurally defaulted his claim. *Accord* Williams v. Pennsylvania, Dept. of Corrections, 146 Fed. App'x 554, 557 (3d Cir. 2005) ("his [*i.e*., the prisoner's] failure to identify defendants Herbert, Street, or Smith in either of his two grievances, means that he failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA."); McCullough v. Miller, Civil No. 06-514, 2008 WL 4361254, at *5 (Sept. 24, 2008) (same); Buehl v. Beard, Civ. A. No. 03-1313, 2007 WL 1830616 (W.D.Pa. June 25, 2007) (same).

In Spruill, although the Court found that the prisoner had procedurally defaulted his claims, it went on to hold that the prison's grievance process excused the procedural default on the facts before it.

> . . . The grievance officer's "Initial Review Response" (the first-level determination under the Grievance System Policy) identified Brown by name. Although the response identified Brown only as someone who had seen Spruill in the course of his medical visits, it is not to be expected that a response rejecting Spruill's

> grievances on the merits would identify any malfeasance on Brown's part. The purpose of the regulation here is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing. As such, the prison can excuse an inmate's failure to do so by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance.
>
> The point is close, but we conclude that the prison grievance officer's recognition that Brown was involved in the events that Spruill complained of excused any procedural defects in Spruill's initial grievances. Spruill's grievances and suit are not about specific instances of insulting treatment by Brown-there would be no constitutional violation there anyway. Rather, the grievances and the suit are about a larger-scale denial of adequate medical care, in which prison officials clearly knew Brown was alleged to be implicated. Thus we reject the District Court's dismissal of Spruill's suit against Brown on these grounds.

Spruill, 372 F. 3d at 234-235.

In the instant action, however, Plaintiff did not identify Defendant Salameh in his grievance or appeals therefrom and so he did not "put [him] on notice of the persons claimed to be guilty of wrongdoing" within the contemplation of Spruill. Moreover, unlike in Spruill, where the prison official charged with responding to Spruill's initial grievance identified Brown by name in the response, with the consequence that the Court of Appeals held the prison had excused the procedural default; here, none of the responses by the prison officials named Dr. Salameh. Moreover, under Spruill, it is a Plaintiff's burden to explain why he did not name a defendant in the grievance. *See* Spruill, 372 F.3d at 234 (Spruill did not [name Brown in his grievance] and has offered no explanation for his failure to do so."). Plaintiff has offered no plausible explanation as to why he did not name Defendant in his grievance. In light of the foregoing, and in the face of the Defendant's explicit argument that Plaintiff procedurally defaulted his claim by not specifically naming him in any grievance, the Plaintiff has not carried his burden under Spruill with respect to explaining why

he failed to name Defendant in the grievances. Because the time for filing any grievances regarding this matter has long passed, the failure to exhaust his administrative remedies must be treated as a procedural default. *See, e.g.*, Spruill, 372 F.3d at 230 (declaring that failure to abide by DOC's internal grievance procedures may result in procedurally defaulting a civil rights claim in federal court, reasoning that "[w]e believe that Congress's policy objectives will be served by interpreting § 1997e(a)'s exhaustion requirement to include a procedural default component.... Congress wanted to erect any barrier it could to suits by prisoners in federal court, and a procedural default rule surely reduces caseloads (even though it may be a blunt instrument for doing so)"); Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002)("[t]o exhaust administrative remedies, a person must follow the rules governing filing and prosecution of a claim .... these include time limits."); Berry v. Kerik, 366 F.3d 85, 86 (2d Cir. 2004) (holding that "in the absence of any justification for not pursuing available remedies, his [*i.e.*, the prisoner's] failure to pursue administrative remedies while they were available precluded his federal lawsuits, and they were properly dismissed with prejudice.") (footnote omitted).

Moreover, this is unlike the situation presentend in Robinson v. Johnson, 343 Fed. App'x 778 (3d Cir. 2009). In that case, the inmate complained about the "yard procedures" for inmates and named in his grievance only the corrections officers he dealt with concerning his access to the yard. Robinson thereafter sued supervisory personnel (Horn and Johnson) even though they were not specifically named in his grievance. The Court of Appeals first noted that Robinson was challenging a DOC policy and that he would likely not have had access to the names of the persons implementing that policy during his grievance proceedings. And, in any event, the court noted that Plaintiff clearly challenged the constitutionality of the prison policy as well as the independent actions of individual

guards. Therefore, although they were not named in the prisoner's grievance, the court found "that the relevant policymakers, Horn and Johnson, were fairly within the compass' of Robinson's grievance." *Id.*, at 782.

In this case, Plaintiff was well aware of Dr. Salameh at the time he wrote his grievance on August 15, 2007. Thus, unlike Robinson, Plaintiff could be expected to know at the time he filed his grievance which supervisory personnel allegedly caused the actions he complained about. Moreover, Porter's grievance did not challenge the constitutionality of prison policy regarding laboratory blood procedures. It merely made the claim that Plaintiff had to wait five days for blood work, which did not have the "stat" designation. Therefore, unlike Robinson, the supervisory personnel in this case could not have been aware from Plaintiff's grievance that his actions were at issue or that he was "fairly within the compass" of Plaintiff's grievance.[2]

In fact, this case is more like Johnson v. Townsend, 314 Fed. App'x 436 (3d Cir. 2008), where the issue involved a prisoner's claims concerning allegedly retaliatory conduct by a specific corrections officer, and the failure of supervisory personnel to act on the prisoner's complaints. In Johnson, the Court of Appeals found that "[t]he initial grievance may have alerted officials to a potential problem regarding Johnson's work schedule and compensation claim and the ensuing appeals of his disagreement with the grievance officers' review, but it did not alert them to the specific acts of unconstitutional conduct they allegedly committed." *Id.*, at 442-43 (emphasis added).

---

2. Moreover, unlike in Robinson, the prison's grievance process in the instant action did not excuse the procedural default. Noting in the Initial Review Response (IRR) identifies Dr. Salameh or any purported policy or procedure. There simply is nothing in these documents to indicate knowledge on the part of Dr. Salameh that there was a problem of which he should have been aware.

Therefore, the court found it was "not at all clear" that the supervisory personnel "were fairly within the compass' " of Johnson's grievance. 314 Fed. App'. at 442-443. The same analysis applies here. Dr. Salameh was not alerted to the specific acts he is alleged to have committed, or to his alleged part in encouraging allegedly unconstitutional practices. Consequently, Plaintiff may not proceed against Dr. Salameh in this action. *Accord* Porter v. Beard, Civil Action No. 09-549, 2010 WL 2541752 (W.D. Pa. June 21, 2010).

As stated by the Court of Appeals for the Third Circuit, "it is beyond the power of this court--or any other--to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (quotation omitted). A unanimous Supreme Court of the United States reiterated this tenet when it affirmed the Third Circuit's holding in Booth v. Churner, 532 U.S. 731 (2001) where the Court confirmed that in the PLRA Congress mandated complete exhaustion of administrative remedies, regardless of the relief offered through those administrative procedures. Consequently, this Court is required to follow the Supreme Court's directive and dismiss Plaintiff's claims against Dr. Salameh as he did not comply with the available mandatory administrative procedures.

### III.  CONCLUSION

For the reasons stated above, it is respectfully recommended that Defendant's Motion for Summary Judgment (ECF No. 54) be granted and that Plaintiff's Motion for Summary Judgment (ECF No. 57) be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall

have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: January 10, 2011

_____
Lisa Pupo Lenihan
United States Magistrate Judge, Chief

cc: Bruce L. Wishnefsky
DQ-4829
SCI-Laurel Highlands
5706 Glades Pike
Somerset, PA 15501